IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF ASHLEY DIPIAZZA,

                 Plaintiff,                       OPINION AND ORDER

     v.

                                           16-cv-060-wmc

THE CITY OF MADISON and JUSTIN BAILEY,
GARY PIHLAJA, and CARY LEEREK,
in their individual capacities,

                 Defendant.

---

In the early morning hours of May 18, 2014, several police officers responded to a report of a domestic disturbance in an apartment on Madison's far east side. After a fight with her boyfriend, a 26-year old woman, Ashley DiPiazza, had taken his gun and barricaded herself inside the apartment's bedroom, threatening to shoot herself. The officers who arrived on the scene tried repeatedly to talk to Ashley, asking and warning her numerous times to put down the gun. At one point, she opened the bedroom door with the gun to her head, but then closed it, refusing to surrender her weapon. When Ashley opened the door and emerged holding the gun to her own head for a second time, officers Justin Bailey and Gary Pihlaja reacted by shooting her several times, killing her.

The district attorney declined to bring criminal charges against any of the officers involved in the incident, and a subsequent internal review by the Madison Police Department found that the officers' actions did not violate departmental policy. Ashley's father, Joseph DiPiazza, instead brought this civil lawsuit under 42 U.S.C. § 1983 in his capacity as the personal representative of Ashley's estate, alleging that defendants Bailey and Pihlaja violated Ashley's Fourth Amendment rights by using unreasonably excessive

force when they shot and killed her. Plaintiff also alleges that another officer on the scene, defendant Cary Leerek, who had taken the lead in negotiating Ashley's voluntary surrender, also violated Ashley's Fourth Amendment rights by failing to intervene to prevent Bailey's and Pihlaja's excessive use of deadly force.[1]

Pending before the court is plaintiff's motion for partial summary judgment against officers Bailey and Pihlaja, contending that their use of deadly force against a woman threatening only suicide was unreasonable as a matter of law. (Dkt. #29.)[2] Defendants also move for summary judgment, contending that: (1) their reactions to this dangerous situation were objectively reasonable as a matter of law; or, alternatively, (2) they are protected by qualified immunity. (Dkt. #41.) For reasons explained in greater detail below, genuine disputes of material fact preclude summary judgment either for plaintiff or for any of the defendants at this time. The court will, therefore, deny both motions.

## UNDISPUTED FACTS[3]

### A. Responding to Call

At approximately 1:21 a.m. on May 18, 2014, Dane County dispatch aired an

---

[1] Plaintiff brings no claims seeking to hold the City of Madison liable for Ashley's death. The City is listed as a party to this case solely for indemnification purposes.

[2] Plaintiff also recently filed a motion to supplement the summary judgment record with a supplemental expert report based on the March 22, 2017 deposition of the Dane County Chief Medical Examiner. (Dkt. #74.) The court will grant that motion, and has reviewed and considered the supplemental report, as reflected in the court's opinion below (to the extent necessary and relevant).

[3] From the parties' proposed findings and the record, and except where noted otherwise, the court finds that the following facts are undisputed for purposes of summary judgment.

"alert tone" calling for available police units to respond to an emergency situation involving a weapon. The dispatch reported that the situation was a domestic disturbance between a male and a female at 1121 MacArthur Road, apartment number two. The female subject had reportedly been drinking alcohol (but had not been using drugs), had taken possession of the male's handgun (a 9mm Glock), and had barricaded herself inside the apartment, while the male left and called the police from a neighboring apartment.[4] The male caller was named Alex, and the female was his girlfriend, Ashley DiPiazza.

Patrol Sgt. Jason Sweeney was nearby at the Madison Police Department's East District precinct when he heard the dispatch alert, and he asked the dispatch to clarify whether the female subject was threatening herself or others. Dispatch responded that the male caller had not specified what the gun was being used for. Sgt. Sweeney was familiar with that address because approximately two months before, in March 2014, he had responded to a possible breaking and entering reported by Ashley DiPiazza at 1121 MacArthur Road, apartment two. On that occasion, Sgt. Sweeney had responded along with officers Bee Xiong, Cate Leerek, and defendant Cary Leerek, and the officers had determined that the apartment was clear of burglars, prowlers, or other threats. Officers Xiong and Cate Leerek spent a significant amount of time in the apartment speaking with Ashley and investigating the situation in March, but Sgt. Sweeney and defendant Cary Leerek were only there for a few minutes.

At approximately 1:27 a.m. on May 18, 2014, officer Xiong was the first to arrive on the scene, followed shortly after by Sgt. Sweeney and several other officers, including

---

[4] The parties dispute whether the dispatch reported that the male subject had "fled" or "escaped" the apartment in fear.

defendants Justin Bailey, Gary Pihlaja, and Cary Leerek. At that time, Sgt. Sweeney was in charge of the situation, and he directed the officers to set up a perimeter outside the building at 1121 MacArthur Road (an apartment building with eight residential units). The door to apartment 2 – where the officers believed Ashley had barricaded herself with the gun – was closed and locked from within. Alex was in apartment 1, which was directly across the hallway from apartment 2, and officer Xiong went in to speak with him. Within five to seven minutes of the officers' arriving on the scene, Alex told officer Xiong – who in turn reported to Sgt. Sweeney – that Ashley had not pointed the gun at Alex, and had not threatened him. Rather, it seemed more like she was threatening herself.

Sgt. Sweeney then began trying to establish contact with Ashley. He first called her cell phone several times, but the calls went immediately to voicemail. Sgt. Sweeney then ordered Bailey, Pihlaja, and a third officer (Chris Keys) to stand in the hallway directly outside apartment 2 to provide support as he began ringing the doorbell.

At this time, Pihlaja was armed with an AR-15 assault rifle (or "long gun"), and Bailey was armed with a .40-caliber Glock handgun. Both were wearing bullet-proof vests under their uniforms that protected their upper torsos. Bailey was also holding the single ballistic shield that the officers had on hand at the scene – a bullet-resistant shield approximately three to four feet tall and two to two and a half feet wide, weighing 40-50 pounds, with a small Plexiglas window near the top. Pihlaja and Bailey positioned themselves outside the door of apartment 2 with Pihlaja as the so-called contact (communicating) officer, pointing his long gun at the door, and Bailey as the cover

(protecting) officer, holding the shield and handgun.  Pihlaja pounded or knocked on the door and began making loud announcements to the effect of "Madison Police Department.  Put the gun down, hands up and come to the door," while Sgt. Sweeney continued ringing the doorbell and trying to call Ashley's phone.  Pihlaja repeated these and similar commands many times, and stated that the officers were not going away, but there was no response from within apartment 2.

## B.  Entering the Apartment

Sgt. Sweeney decided to enter the apartment, and he obtained a key from Alex to do so.  After knocking numerous times without response, he used the key to open the front door to the apartment.  Sgt. Sweeney ordered the officers not to enter the apartment, but to stack themselves behind Bailey's ballistic shield so that they would have cover as the door swung open.  Pihlaja continued repeating similar announcements and warnings, identifying themselves as police officers, now addressing Ashley by name and ordering her to put down the gun and put her hands in the air.  The apartment was well lit.  The following is a rough layout, with approximate dimensions, of unit 2:



14-150863
05-18-2014
1121 Macarthur Rd #2
Officer Involved Shooting
Inv. Ray Hessefort
Distances:
A to B = Approx 9'
A to C = Approx 12'6"
A to D = Approx 17'4"
A to E = Approx 17'10"
C to E = Approx 7'5"

Once the front door was all the way open, Sgt. Sweeney, Pihlaja, and Bailey could see the entire living room and kitchen, which appeared to be empty. However, one or more of the officers heard muffled crying coming from behind the closed bedroom door across the living room, so they believed that Ashley was inside the bedroom. Pihlaja and Bailey were still standing in the open frame of the front door to the apartment, both partially covered by Bailey's ballistic shield. Pihlaja then tried to make verbal contact

with Ashley, again announcing loudly, "Madison Police," and telling her to put the gun down and to come out of the bedroom with her hands up. The officers heard Ashley through the bedroom door crying, pause, and say something to the effect of "go away, I'm not coming out," before the crying continued. Pihlaja said something to the effect of "I understand that maybe something happened between you and your boyfriend tonight. It's okay. We can work through that. We can deal with that. We just want to make sure no one gets hurt. I just need you to put that gun down and come out of the bedroom."

Pihlaja continued trying to engage Ashley, but with no more success.[5] The officers could hear Ashley say something behind the closed bedroom door, but they could not make out what. They were able to hear enough, however, to conclude that she "sounded intoxicated." After approximately five or ten minutes more of this type of limited exchange, Sgt. Sweeney interceded to try to move things along, saying, "Ashley, I know you're having a bad night. I just need to make sure you're okay. Can you at least open the door and talk to me?"

At some point, the bedroom door suddenly opened. The officers saw Ashley step into view and approach the open bedroom doorway, holding a handgun to the side of her

---

[5] Pihlaja and Bailey state that at some point, prior to making contact with Ashley, they were told by someone and came to believe (erroneously, as it turned out), that Ashley could be a military veteran with possible post-traumatic stress disorder. Plaintiff disputes this, pointing to evidence suggesting that Pihlaja and Bailey could only have heard this rumored (and, as it turned out, false) information *after* the shooting, so they could not have factored it into their calculation and assessment of any threat that they perceived from Ashley that night. (Dkt. 65, at ¶ 142.)

head.[6]  She was crying and seemed very upset.  Ashley said something to the effect of "I'm not coming out," and she also said something about wanting to call or speak with her father.  The officers heard her yelling something that they could not understand.  Ashley did not appear to be physically injured, nor did she make any verbal threats or point the gun at anyone else, keeping it held to her own temple.  Pihlaja ordered Ashley to "drop it" or "drop the gun," but she did not comply.  Pihlaja raised his rifle and pointed it at Ashley.  Sgt. Sweeney said something like "get back, get back," and the officers backed up and retreated several feet toward the hallway.  Approximately four seconds after Ashley had opened the bedroom door, she backed up into the room and shut it again.

## C. Negotiations

At this time, now approximately 1:43 a.m., Sgt. Sweeney requested that defendant Cary Leerek – who was a SWAT officer and a trained crisis negotiator – take over the lead role and try to communicate with Ashley.  Leerek was already nearby outside the building, and she quickly joined Sgt. Sweeney and the others in the apartment hallway.  The officers then took Leerek into apartment 1 and briefed her on the entire situation so far.  There she also spoke to Alex directly.

As the lead contact officer and negotiator, Leerek then assumed control of the attempts to communicate with Ashley.  She took the ballistic shield from Bailey and

---

[6] The parties dispute the exact location where Ashley was standing, and the extent to which she approached the open bedroom doorway from the inside, or stood in the doorway threshold, or exited the bedroom door completely and came out a short distance into the living area.  (Dkt. #54, at ¶ 26; Dkt. #65, at ¶ 158.)

approached the open front door of apartment 2, as Bailey and Pihlaja went alongside her to provide cover. Sgt. Sweeney also requested that a second shield be brought to the scene, although Leerek did not wait for it to arrive. SWAT officer Nick Eull, who was standing nearby outside the apartment door, and who was wearing heavier, extra body armor over his uniform, offered to relieve Bailey or Pihlaja at this point. Both declined Eull's offer.

Leerek then entered through the front door into the apartment, holding the ballistic shield on the left side of the doorway. She also unholstered her handgun. Pihlaja was just to Leerek's right, partially covered by her shield, and was armed with his long gun. Bailey was on the right side of the door frame, armed with his handgun. Pihlaja and Bailey both had their firearms out, aimed slightly downward, ready to use if an imminent threat presented itself.[7] The three of them did not explicitly discuss or agree on a specific plan of approach or engagement with Ashley, other than to follow Leerek's lead, rely on their training, and react appropriately to events.[8]

More generally, Leerek prepared to make verbal contact with Ashley, believing that getting the subject talking was the best way to handle the situation and resolve it safely, while Pihlaja and Bailey were charged with observing the subject and protecting Leerek and others, if necessary. Leerek was mindful of the risks posed by situation,

---

[7] While other officers on the scene either had or were supposed to have non-lethal weapons like tasers, pepper spray, or beanbag shotguns on hand, none of the three officers entering the apartment was carrying any of these weapons.

[8] The parties dispute the extent to which the three officers made, or were practically able to make. *any* plan for engaging with Ashley, including plans for how to cover or protect themselves during any encounter that ensured. (Dkt. #54, at ¶¶ 46-58.)

understanding that Ashley had been drinking, and she was upset, armed with a gun, and potentially suicidal. Even so, Leerek did not believe she was in imminent danger of harm at that time.

Leerek then introduced herself and began trying to talk to Ashley through the bedroom door. After about a minute, Ashley began responding. She sounded like she was crying, but Leerek could not understand what she was saying. Leerek asked if they could use a phone to talk, but Ashley said she did not have a phone in the bedroom.

Leerek proceeded to try to talk to Ashley through the bedroom door for approximately 20-25 minutes. During that period, Ashley mentioned that Alex had cheated on her; she mentioned the word "suicide"; and she asked Leerek to bring Alex out into the hallway so she could see him or talk to him "one last time." Leerek asked Ashley what she meant by that request, explaining that if she put the gun down and came out from the bedroom, there would be more opportunities to see and speak with Alex. At one point, Ashley responded that Leerek was "lying" or a "liar." Leerek told Ashley repeatedly to put the gun down and come out from the bedroom, and made clear that she could not see Alex or anyone else until she put down the gun. Ashley then said that she was "not going to hurt anyone else," but that she would hurt herself.

Ashley also repeated her request to see or speak with Alex in person, and she mentioned speaking with her father, but Leerek again told her that she first had to put down the gun and come out of the bedroom without it.[9] Knowing that officers were

_____

[9] Leerek's exact words throughout this conversation are disputed by plaintiff, in large part because of purported discrepancies between her initial report and her later testimony. (Dkt. #65, at ¶¶ 238-299.)

already trying to find contact information for Ashley's father, Leerek then asked another officer to find contact information for Ashley's uncle, who apparently worked in law enforcement, or to find information for any other family or friends they could contact. At some point, though exactly when is unclear, Leerek heard banging and pounding in the bedroom, and Ashley said, "you really want to be the officer that makes me do this?"[10]

It was still difficult for Leerek to hear through the closed bedroom door, and she eventually convinced Ashley to open the door a crack so that they could communicate more easily. They did this for a short period before Ashley shut the door again. Leerek told Ashley, "let's resolve this, I'd like to be able to have you come out and talk to anyone you want to talk to, but we need to make sure that's done safely, and you need to be away from the gun and put the gun down and come out without the gun."

### D. Shots Fired

Without warning, Ashley said "Fine," and opened the bedroom door. The parties dispute the precise succession of words and events that led her to open the door, and they dispute whether Ashley acted suddenly, aggressively, or angrily, or whether she was acting calmly at that point. (Dkt. #65, at ¶¶ 318-348.) What is clear is that Ashley emerged from the open bedroom doorway a second time at approximately 2:10 a.m., again holding the gun to her head. One or more of the officers yelled some combination

---

[10] Plaintiff asserts that these sounds and words occurred early on in the conversation, before Leerek was able to establish a rapport with Ashley, after which Ashley calmed down. (Dkt. #65, at ¶¶ 301-306.)

of "Gun," "Drop the gun," or "Drop it," and within a matter of a few seconds, shots were fired. Bailey fired first with this handgun,[11] and closely or immediately after he fired this first shot, Pihlaja fired his rifle. Bailey aimed his handgun at Ashley's "high center mass" and fired five shots. Pihlaja aimed his rifle at Ashley's "center mass" and fired eight shots. All thirteen shots were fired within a period of two to five seconds. Ashley was hit with eleven bullets, and collapsed face down onto the floor.

Ashley collapsed in an awkward position on the ground, and Pihlaja yelled something like "if you can hear me, don't touch the gun" or "don't move." Ashley remained unresponsive, motionless on the ground. When the shots stopped, Sgt. Sweeney yelled out and immediately ran to the three officers by the door, then into the apartment to try to administer aid. Pihlaja followed and reached underneath Ashley's body to grab the gun she had been holding, as she had collapsed on top of it. He then removed the gun and put it in the kitchen. Sgt. Sweeney checked for a pulse, and radioed for EMS to enter, but Ashley was already dead.

The parties dispute: where exactly Ashley fell; where exactly she had been standing; and whether she had been moving when the gunshots were fired. (Dkt. #54, at ¶¶ 77-81; Dkt. #65, at ¶¶ 349-56, 360, 370.) More specifically, they dispute whether she was inside the bedroom just within the doorway, in the middle of the doorway threshold, or had cleared the threshold and was in the living area. They further dispute whether Ashley was advancing out into the living area toward the officers – and thereby closing the distance between herself and them – when she was shot. The parties also

---

[11] The parties dispute whether Bailey issued any commands or said anything at all before firing the first shot. (Dkt. #65, at ¶¶ 357-367.)

dispute whether the photographs contained in the record accurately portray Ashley's body in close to the same position she was in immediately after being shot, or whether the position and location of her body was moved significantly by police officers and emergency medical personnel attempting to render aid after Ashley was shot.

Subject to these factual disputes, the parties agree that Ashley was probably somewhere between 12.5 and 18 feet away from the officers when they shot her. The parties also agree that Ashley never pointed her gun at anyone besides herself, never moved or directed the gun from her own head toward the direction of the officers, and never made any explicit verbal threats toward them.

Defendants Bailey and Pihlaja have both testified that they considered Ashley to be an imminent threat at the time they fired because she could have turned her gun toward the officers very quickly, and could have fired a shot very quickly, before they or Leerek would have been able to react in self-defense. (Defendants refer to this predicament as the "reactionary gap" principle, something they aver was emphasized in their police training.) In particular, they noted the danger to Bailey, based on his lack of cover or concealment (unlike Pihlaja and Leerek, who were at least partially protected by the ballistic shield).

### E. Criminal and Administrative Investigation

The Wisconsin Department of Justice's Division of Criminal Investigation conducted an inquiry into the shooting and turned over its investigative file to Dane County District Attorney Ismael Ozanne, who declined to bring criminal charges against officers Bailey and Pihlaja. The Madison Police Department's Professional Standards

and Internal Affairs unit also conducted an internal review, and it found that Bailey's and Pihlaja's use of deadly force complied with department policy and training. This lawsuit followed.[12]

## OPINION

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering each party's motion for summary judgment, the court construes all facts and draws all reasonable inferences in plaintiff's favor. *Id.* at 255. But "the non-moving party does not bear the burden of proving his case; the opponent of summary judgment need only point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011).

Both plaintiff and defendants contend that they are entitled to judgment as a matter of law under the Fourth Amendment to the United States Constitution. "A police

---

[12] Plaintiff also presents a substantial amount of evidence of the MPD's policy and training regarding the use of force in response to threats generally, and also specifically regarding the proper response to dangerous situations involving potentially suicidal individuals, which plaintiff claims belies the result of the MPD internal review. Some of this evidence is also undisputed – for example, that Madison police officers are trained that Wisconsin law prohibits officers from using deadly force to prevent suicide (Dkt. #66, at ¶ 291) – but much of it is disputed, immaterial, or both.

officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). The Supreme Court has long held, as a matter of legal principle, that "it is reasonable to use deadly force if the officer, when exercising his or her reason and judgment, has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, warns the suspect before firing." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).

In reviewing an officer's decision to employ deadly force, what matters is not the officer's subjective beliefs or intentions, but the *objective reasonableness* of the officer's threat assessment and response. *Graham v. Connor*, 490 U.S. 386, 388, 396-99 (1989).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (internal citations omitted). The determination of whether an officer's use of force is "reasonable" is therefore highly context-specific, and requires a full consideration of and appreciation for the totality of the circumstances. *Id.*; *Garner*, 471 U.S. at 8-9.

## I. Plaintiff's Motion for Partial Summary Judgment Against Officers Bailey and Pihlaja

Plaintiff contends that the undisputed facts establish that Ashley posed only a *potential* threat to the officers, as opposed to an *actual* or *immediate* or *imminent* threat. Accordingly, plaintiff argues, "[s]ummary judgment as to the two shooters is warranted because the use of deadly force to respond to a potential threat or the inherent danger involved when facing an armed suicidal person is unreasonable as a matter of law." (Dkt. #30, at 1.) Plaintiff relies primarily on three Seventh Circuit cases as authority in support of this argument: *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012); *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015); and *Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015), *cert. denied sub nom. Blanchard v. Brown*, 136 S. Ct. 1712 (2016).

The fundamental problem with plaintiff's argument, however, is that the parties *genuinely dispute* material facts relevant to the question whether Ashley posed an imminent threat (as defendants claim) or only a potential threat (as plaintiff claims), and there is evidence to support both positions. Defendants do not dispute the essential facts that Ashley never attacked the officers, never pointed the gun at anyone other than herself, and never verbally threatened to harm anyone other than herself. Contrary to what plaintiff seems to argue, however, there is no controlling precedent or authority that holds an apparently suicidal individual with a gun *cannot as a matter of law* be considered an imminent threat, so long as she does not move or point her gun toward another person, or issue any explicit verbal threats.

Of the three cases on which plaintiff relies most, only *Phillips* ruled that the plaintiff was entitled to judgment against the officers who used force against her as a matter of law, and the facts in that case are materially distinct from those here, especially when viewed in defendants' favor. In *Phillips*, seven police cars surrounded a drunk driver who had crashed her car off the side of the road. When the drunk driver did not respond to orders to come out of her car, officers shot her four times in the leg with a non-lethal firearm, causing serious injury. The officers apparently had no reason to believe, and importantly made *no* claim that they believed, Phillips was an *imminent* threat to anyone, arguing instead "that Phillips continued to present a potential threat while she remained in the car because they believed the vehicle was running and could be used as a weapon." *Phillips*, 678 F.3d at 525. The officers also argued that she "demonstrated continuous 'defiance' by failing to follow their commands to exit the vehicle." *Id.* at 524.

The Seventh Circuit found that the officers' characterization "strains credulity given the circumstances." *Id.* In particular, there was no dispute that Phillips appeared highly intoxicated and remained passively inside her crashed car. Moreover, Phillips was surrounded by and exposed to the police officers, who were clearly in control of the situation. Under those circumstances, the court concluded that "it was objectively unreasonable to shoot Phillips four times with the [non-lethal gun] when she posed no immediate threat and offered no active resistance." *Id.* at 526. The Seventh Circuit, therefore, reversed the district court's judgment, entered after a jury trial and verdict in favor of the officers, and directed the district court to enter judgment as a matter of law for the plaintiff.

The other two cases on which plaintiff primarily relies are much closer factually to the case now before this court. Both involved officers' use of deadly force against suicidal individuals holding either a gun (*Weinmann*) or a knife (*Williams*). In each, however, the Seventh Circuit merely affirmed the district court's denial of summary judgment *for the officers* based on qualified immunity analysis. Thus, both decisions support denying the officers here judgment as a matter of law, including on qualified immunity grounds, but *not* granting summary judgment as a matter of law in plaintiff's favor. *See Williams*, 797 F.3d at 485 ("as in *Weinmann* the [plaintiff's] mere possession of the knife is insufficient to warrant summary judgment" for the officers, where additional facts about the level and immediacy of the threat were disputed); *Weinmann*, 787 F.3d at 451 ("The existence of a factual dispute about the circumstances surrounding McClone's decision to fire on [Weinmann] precludes a ruling on qualified immunity at this point. The district court correctly recognized this.").

Accordingly, while plaintiff correctly identifies the Seventh Circuit decisions most germane to both parties' motions for summary judgement, these decisions do not support plaintiff's own motion for partial summary judgment as to officers Bailey and Pihlaja. In *Phillips,* there was never a question whether the threat the officers faced was *imminent*; it was undisputed on appeal that it was not. And in *Williams* and *Weinmann*, a plaintiff's entitlement to summary judgment on facts far more similar to those here was not even discussed as a possibility.

Regardless, the record here reveals a series of admittedly subtle factual disputes that may bear materially on how a reasonable officer in Bailey's and Pihlaja's shoes would

have judged the threat posed by an intoxicated, suicidal woman, who (unlike Phillips) had intentionally refused repeated warnings to disarm, acted in fits and starts, and then entered the room with a gun held to her own head. Chief among these are disputes about: how suddenly or abruptly Ashley opened the door to the bedroom the second time; how her actions and demeanor appeared compared to the first time she opened the door with a gun to her head; whether she appeared angry, aggressive, or threatening in her words or movements; how far and how quickly she advanced past the bedroom door into the living room; whether she was moving toward the officers; whether Bailey and Pihlaja warned her at that moment to stop and drop the gun; and how long they waited before firing. There are also genuine (albeit even subtler) disputes as to several other factual issues from earlier in the night that might materially influence a reasonable officer's threat assessment given the totality of the circumstances. If one accepts defendants' version of these facts entirely – as the court must in evaluating plaintiff's motion for partial summary judgment – a reasonable trier of fact could find that Bailey and Pihlaja reasonably believed that Ashley posed an actual, immediate threat to them, to Leerek, or to others. Thus, the court must deny plaintiff's motion for partial summary judgment.

## II.    Defendants' Motion for Summary Judgment

At the opposite end of the spectrum, defendants contend that that their actions were objectively reasonable as a matter of law, entitling them to summary judgment or, alternatively, at least to qualified immunity. For the reasons set forth below, both

contentions fail when viewing the same critical factual disputes in plaintiff's favor, as the court must in considering defendants' motion for summary judgment.

### a. Liability

"The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. . . . [The] court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). The court will address defendants arguments' first as to the two shooting officers, Bailey and Pihlaja, and then as to officer Leerek, who allegedly failed to intervene to stop them.

### i. Officers Bailey and Pihlaja

A police officer may lawfully use deadly force "if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (quoting *Garner*, 471 U.S. at 11-12). Stating that principle in reverse, Ashley had "a constitutional right not to be shot on sight if [s]he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime." *Weinmann*, 787 F.3d at 448. Bailey and Pihlaja both contend that they believed Ashley posed an imminent threat of death or serious bodily injury to them, to Leerek, or to others at the time they fired their weapons. Therefore, the question for the trier of

fact in this case is whether that belief was "objectively reasonable." More specifically, on defendant's motion for summary judgment, the question is whether the officer's belief was objectively reasonable accepting *plaintiff's* version of the disputed facts. *Id.* at 448-50. To defeat defendants' motion as to the shooting officers, therefore, plaintiff must present evidence sufficient to create a genuine dispute of material fact as to the objective reasonableness of Bailey's and Pihlaja's purported belief that Ashley posed an imminent threat of death or serious bodily injury at the time they fired their weapons.

Here, plaintiff submitted extensive evidence to show that Ashley was both objectively and subjectively perceived by the responding officers as a *suicide* risk, and that she never said or did anything threatening toward anyone other than herself. Evidence of defendants' conduct, as well as what information was known to them over the course of the night leading up to the moment in which Ashley was ultimately shot, is relevant to the determination whether Bailey's and Pihlaja's use of force was objectively reasonable under a totality-of-the-circumstances analysis. *See, e.g.*, *Williams*, 797 F.3d at 483; *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999); *Estate of Heenan ex rel. Heenan v. City of Madison*, 111 F. Supp. 3d 929, 944 (W.D. Wis. 2015); *Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 960-61 (E.D. Wis. 2003). Further, plaintiff genuinely disputes nearly every fact that defendants rely on to support the reasonableness of their belief that Ashley posed an imminent threat to others.

Taking plaintiff's version of the disputed facts – as the court must on defendants' motion for summary judgment – a trier of fact could reasonably conclude that an objective officer would have found that Ashley posed only a potential threat to herself.

21

*See Williams*, 797 F.3d at 483. Moreover, where the most important evidence comes from the statements of the officers involved in Ashley's death – and plaintiff has limited opportunity to contradict that evidence directly, other than through impeachment – the trier of fact must take a critical view of defendants' self-serving testimony to the contrary. *Plakas*, 19 F.3d at 1147. As such, a trial is necessary to resolve questions about the credibility of the officers' testimony, as well as the other material factual disputes already identified.

### ii. Officer Leerek

The question of officer Leerek's liability is a much closer one than that of the other two officers. "A police officer can be liable for another officer's excessive force only if that officer had a realistic opportunity to intervene and stop the first officer's actions." *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). In Leerek's case, this means she must have had: (1) reason to know that excessive or unreasonable force was being used; *and* (2) a realistic opportunity to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

As the court has already determined, there is at least a genuine dispute as to whether Bailey and Pihlaja in fact used excessive force under the totality of the circumstances. Defendants also point out that under any version of the facts, events unfolded quickly and Ashley was shot only a few seconds after she emerged from the bedroom for a second time. Given Leerek's testimony that she was focused on Ashley and "did not have the opportunity to break from her own decision-making process to

direct the actions of the Officers Bailey and Pihlaja" during those tense few seconds, it would appear unlikely, if not unreasonable, to expect that Leerek even knew that those officer were about to shoot her, much less had a realistic opportunity to intervene and stop them. (Dkt. #47, at 27.) On the other hand, that is more or less the situation that Sgt. Sweeney had faced when Ashley emerged from the bedroom the first time, and his quick reaction within a few seconds, ordering his officers to "get back, get back" may have defused the situation, thereby preventing Pihlaja or Bailey from opening fire at that time.

More importantly, the Seventh Circuit has cautioned that because of their fact-intensive and context-specific nature, failure-to-intervene claims are rarely susceptible to resolution on summary judgment. *Abdullahi*, 423 F.3d at 774 ("[T]his Court has made clear that the prongs of this analysis almost always implicate questions of fact for the jury."). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997). By allowing this claim to proceed to trial, the court also avoids the risk of an inconsistent result, should defendants Pihlaja or Bailey fault Leerek for not affirmatively stopping them from shooting.

Thus, although a close question, the court will err on the side of allowing a trier of fact to consider this issue at trial, particularly since a trial is necessitated here regardless. While finding that the undisputed facts do not prevent a reasonable jury from possibly

concluding that Leerek could realistically have intervened and prevented Bailey and Pihlaja from firing at Ashley, at least on the record at summary judgment, the court reserves the possibility of directing a verdict as to Leerek's liability on a more fulsome trial record.

### b. Qualified Immunity

The same factual disputes that preclude summary judgment for defendants on liability also preclude summary judgment with regard to their qualified immunity defenses. *See Estate of Robinson ex rel. Irwin v. City of Madison*, No. 15-CV-502-JDP, 2017 WL 564682, at *20 (W.D. Wis. Feb. 13, 2017), *motion to certify appeal denied sub nom. Estate of Robinson ex rel. Pers. Representative Andrea Irwin v. City of Madison*, No. 15-CV-502-JDP, 2017 WL 685527 (W.D. Wis. Feb. 16, 2017).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As courts often remind plaintiffs, when it comes to suing police officers for misconduct in the line of duty, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Whether a qualified immunity defense is available involves a two-part test to determine: (1) whether the officer violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is "clearly established" when a reasonable

officer would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

As explained above, if the court accepts plaintiff's version of all of the genuinely disputed facts – as it must – then officers Bailey and Pihlaja violated Ashley's clearly established "constitutional right not to be shot on sight if [s]he did not put anyone else in imminent danger." *Weinmann*, 787 F.3d at 448. The second part of the qualified immunity analysis, whether that right was clearly established as of May 18, 2014, is only a slightly more difficult question.

While defendants correctly point out that plaintiff cannot rely on law established after the date of the shooting, and *Weinmann* and *Williams* were both decided in 2015, these decisions are deeply rooted in – and decided on the basis of – legal principles that were already clearly established. In *Williams*, a case that arose from a May 2012 shooting, the court held that "[i]t is well-established—and has been since long before the shooting at issue here—that a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Williams*, 797 F.3d at 484 (citing *Weinmann*, 787 F.3d at 448; *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 705 (7th Cir. 2009); *Muhammed*, 316 F.3d at 683; *Garner*, 471 U.S. at 11–12). *See also Williams*, 797 F.3d at 485 ("We are aware that officers responding to a scene in which a suicidal person is locked in a room are faced with the difficult determination as to whether delay in responding will allow the person

to further harm himself or to become aggressive toward others. It is clearly established, however, that officers cannot resort as an initial matter to lethal force on a person who is merely passively resisting and has not presented any threat of harm to others.").

Another illuminating case is *Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010), issued some four years before the shooting here. In that case, the Seventh Circuit held it to be "clearly established" that police officers could not even use *tear gas* against an individual who was alone in his apartment, did not pose an actual threat to others, was "armed but merely suicidal as opposed to homicidal," and "did not point his gun at anyone but himself." *Id.* at 783. That being the law by 2010, the officers here knew or should have known that they could not use deadly force in such circumstances.

In *Weinmann*, the Seventh Circuit looked to cases from other circuits in determining that the law was clearly established as early as 2007 "that officers may not use deadly force against suicidal people unless they threaten harm to others, including the officers." *Weinmann*, 787 F.3d at 450-51 (citing *Mercado v. City of Orlando,* 407 F.3d 1152, 1157–58 (11th Cir. 2005); *Yates v. City of Cleveland,* 941 F.2d 444, 449 (6th Cir. 1991)). Accordingly, on facts quite similar to those here, the court affirmed the denial of qualified immunity for the shooting officer. Because plaintiff's evidence creates at least a factual dispute as to whether Ashley in fact threatened the officers (or anyone besides herself) in any way, Bailey's and Pihlaja's arguments for qualified immunity fail for the same reasons.

As to Leerek, it is less clear whether, in failing to intervene on Ashley's behalf, she was performing a "discretionary function" that could entitle her to qualified immunity under *any* circumstances. *See Harlow*, 457 U.S. at 816-18. The court need not answer

that question, however, because in resolving all disputed facts in plaintiff's favor, Leerek must be denied a qualified immunity defense even if the doctrine does apply generally to this type of claim. As noted above, at least on the totality of circumstances presented on summary judgment, a reasonable jury might find that Leerek could realistically have intervened and prevented Bailey and Pihlaja from firing unreasonably at Ashley, and that she failed to do so. Under Seventh Circuit authority that was clearly established before May 2014, that would be a violation of Ashley's Fourth Amendment rights. *Miller*, 761 F.3d at 826; *Abdullahi*, 423 F.3d at 774; *Lanigan*, 110 F.3d at 478; *Yang*, 37 F.3d at 285.

Because genuine disputes of material fact preclude the court's answering whether clearly established constitutional rights were violated at the time of Ashley's shooting on summary judgment, *see Estate of Robinson*, No. 15-CV-502-JDP, 2017 WL 564682, at *20, defendants' motion for summary judgment on liability or qualified immunity grounds must be denied.

## ORDER

IT IS ORDERED that:

1) The motion for partial summary judgment filed by plaintiff the Estate of Ashley DiPiazza by Personal Representative Joseph DiPiazza (Dkt. #29) is DENIED.

2) The motion for summary judgment filed by defendants Justin Bailey, Gary Pihlaja, and Cary Leerek (Dkt. #41) is DENIED.

3) Plaintiff's motion to supplement the summary judgment record (Dkt. #74) is GRANTED.

Entered this 11th day of April, 2017.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge