IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF ASHLEY DIPIAZZA,

               Plaintiff,                        OPINION AND ORDER

    v.

                                               16-cv-60-wmc

THE CITY OF MADISON and JUSTIN BAILEY,
GARY PIHLAJA, and CARY LEEREK,
in their individual capacities,

               Defendants.

---

The court has received some 29 motions in limine in this case -- seventeen filed by plaintiff alone. (Dkts. ##118-148). Some are fairly easily resolved based on agreement of the parties, the court's prior ruling on the admissibility of expert testimony (dkt. #199), and its ruling on the discovery of Ms. DiPiazza's medical records (dkt. #196), but others present more difficult or uncertain issues that may require further clarification at the final pretrial conference. The court addresses each in turn below, starting with plaintiff's motions.[1]

### A. Plaintiff's Motions in Limine

    **1. Plaintiff's motion to preclude testimony that defendants were "cleared" or "exonerated" (dkt. #118); _and_**

    **2. Plaintiff's motion to exclude evidence of defendants' commendation from liability phase (dkt. #119).**

Defendants do not oppose plaintiff's first or second motions in limine, and they are GRANTED.

---

[1] This opinion assumes basic familiarity with the facts and legal issues in this case set forth in the court's summary judgment opinon and order (dkt. #91.)

### 3. Plaintiff's motion to exclude results of gun inspection (dkt. #120).

Defendants agree that the results of any inspection of the gun Ms. DiPiazza was holding after she was shot, which revealed that the gun was in working order and loaded with 15 rounds, have no relevance in the jury's assessment of what the officers reasonably perceived at the time they discharged their weapons. Defendants thus agree that this evidence would be inadmissible, unless plaintiff somehow opened the door by making Ms. DiPiazza's actual intent an issue in the case. The court agrees on both scores, although any effort to introduce the latter during the liability phase of trial is also excluded. Accordingly, the court GRANTS this motion subject to plaintiff's reopening the issue. The parties are free to enter a stipulation regarding the introduction of evidence of Ms. DiPiazza's actual intent, as defendants suggest. Barring that, the subject is closed in the first phase of trial.

### 4. Plaintiff's motion to exclude prior police contacts (dkt. #121); *and*

### 5. Plaintiff's motion to exclude character evidence learned after victim's death (dkt. #122).

Defendants do not oppose plaintiff's fourth or fifth motions in limine and, therefore, they are also GRANTED, at least for the liability phase, unless these (purported) facts were known to the defendants before their challenged actions. *See Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) ("Knowledge of facts and circumstances gained after the fact … has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise … the jury would possess more information than the officer possessed when he made the

crucial decision. Thus, we are convinced that the objective reasonableness standard …
requires that Officer Berry's liability be determined exclusively upon an examination and
weighing of the information Officer Berry possessed immediately prior to and at the very
moment he fired the fatal shot. The reception of evidence or any information beyond
that which Officer Berry had and reasonably believed at the time he fired his revolver is
improper, irrelevant and prejudicial to the determination of whether Officer Berry acted
reasonably 'under the circumstances.'").

6. **Plaintiff's motion to exclude evidence of wages, health, or life expectancy in damages phase (dkt. #123).**

This motion raises many of the same issues the court touched on in an opinion
and order (dkt. #196), which denied both parties' discovery motions regarding Ms.
DiPiazza's mental health records. The parties' follow-up briefing on this motion in
limine sheds little additional light on the issues. Indeed, the limited case law on point,
which both sides contend supports their respective positions, remains largely unhelpful,
except to call into question the relevance or admissibility of any evidence of the
decedent's specific health or habits to prove "loss of life" damages in a § 1983 suit
brought solely under federal law by the decedent's estate. *Bass by Lewis v. Wallenstein*,
769 F.2d 1173, 1190 (7th Cir. 1985). Moreover, the court has neither been cited nor
found legal authority holding that this evidence would be appropriate to prove "loss of
life" damages in this context. To the contrary:

> Section 1983 damages are considered to be appropriate as long as those
> damages generally effectuate the policies underlying § 1983. The
> fundamental policies underlying § 1983 are compensation for, and
> deterrence of, unconstitutional acts committed under state law. . . . The

> loss of life award to [a decedent's] estate is directed towards deterring any police officer who would contemplate taking the life of a person who poses no threat of harm to the officer or the public.

*Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1104-05 (7th Cir. 1990).

At least for purposes of damages under § 1983, as plaintiff contends for a second time in its motion in limine, a life is a life, all lives are equal, and there is no distinguishing one life (however happy) from another (however miserable). The irony is that *plaintiff* is the party prepared to abide by this principle, not defendants. Accordingly, the court GRANTS this motion, again with the caveat that plaintiff may well open this door depending on how it frames its affirmative case for damages, particularly given plaintiff's plan "to introduce" Ashley DiPiazza to the jury through family and friend witnesses. What that means in practice remains unclear, so plaintiff should be prepared to clarify its plan and defend its proposal, in light of seemingly contrary legal authority. If a life is a life under § 1983, and its purpose is not to discriminate, but merely to protect, and deter the unlawful taking of life, then the question remains what relevance there is in specific evidence of who Ashley DiPiazza was as a person, or the kinds of things she liked doing, even at the damages phase.

### 7. Plaintiff's motion to strike defendants' proposed damages experts (dkt. #124).

On March 8, 2017, defendants disclosed two, "non-retained" experts on damages under Fed. R. Civ. P. 26(a)(2)(C), but for neither -- an emergency room doctor and a physician's assistant, both of whom apparently treated Ms. DiPiazza for an injury on one occasion -- did defendants disclose the subject matter, much less "a summary of facts and

opinion to which [they are] expected to testify." To the contrary, plaintiff has submitted documentation suggesting that the physician's assistant was not even aware that she was listed as a witness for this case (nor even aware of this case), and she has never spoken with defendants' counsel. Defendants have effectively acknowledged their failure to comply with the basic disclosure requirements of Rule 26 necessary to allow these two individuals to testify, by virtue of filing no response to this motion in limine. Accordingly, the motion is GRANTED, and defendants' two, so-called "non-retained damages experts" are precluded from expressing any expert opinions at trial.

### 8. Plaintiff's motion to exclude information unavailable to officers from 911 call (dkt. #133).

Plaintiff moves to exclude evidence of information provided during the 911 call unless it was relayed to the officers responding to the reported disturbance on May 18, 2014. Specifically, they move to exclude a statement by Ms. DiPiazza's boyfriend to the 911 operator that he was "a little afraid, really afraid," since there is no evidence that this was relayed to the officers dispatched to the scene. Defendants respond that this statement was not necessary for the officers (or any reasonable person) to conclude that the boyfriend was, in fact, afraid of his gun-wielding girlfriend, but that misses the thrust of the plaintiff's eighth motion. Indeed, defendants offer no direct response or reason why the boyfriend's statement itself is relevant and admissible. Without evidence that any statement made to or by the 911 dispatcher was relayed to at least one of the responding officers, it is not relevant to their assessment of the situation. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (issue of reasonableness of defendants' action is

limited to what they knew at the time, under the totality of the circumstances as they perceived them objectively). Thus, plaintiff's motion is GRANTED, and defendants are barred from introducing this or similar evidence, unless they can show that it was available to and known by the officers responding to the scene at that time.

9. **Plaintiff's motion to preclude referring to Ms. DiPiazza as "criminal" or "suspect" (dkt. #136).**

Defendants do not oppose this motion. The court agrees with plaintiff that referring to Ms. DiPiazza as "the criminal" or even "the suspect" during trial poses a risk of unfair prejudice. Similarly prejudicial would be for plaintiff to refer to her as the "victim." Accordingly, the motion is GRANTED. Instead, she should be referred to at trial as "Ms. DiPiazza," "DiPiazza," "the deceased," or "decedent."

10. **Plaintiff's motion to exclude hypothetical, "worst case" evidence (dkt. #138).**

Plaintiff moves to preclude any defense witness from speculating about hypothetical, "worst case" training scenarios. This is a bridge too far for plaintiff. Certainly, no witness will be permitted to testify based on unfounded speculation; both fact and expert witnesses must limit their testimony to matters within their knowledge, experience, or expertise. As defendants point out, however, witnesses are permitted to make inferences reasonably based on their knowledge and experience. In particular, the court agrees with defendants that the Seventh Circuit's decision in *Nelson v. City of Chicago*, 810 F.3d 1061 (7th Cir. 2016), is of no use to plaintiff on this issue. In that case, one of four officers involved in a traffic stop was allowed to testify about what they probably or usually *would have done* at a traffic stop, even after all four officers had

admitted to having *no actual memory* of the challenged traffic stop. The Seventh Circuit found this testimony was too speculative to be admitted. *Id*. at 1074-75.

Here, in contrast, plaintiff's main objection seems to be to defendant Pihlaja's testimony about a *past* training scenario, where he confronted a (fictional) suspect who emerged from a car and put a gun to their own head. While the relevance of this testimony, should it be introduced, is limited, the *Nelson* decision does not preclude its use to illustrate how the training informed Pihlaja's understanding of the kind of threat Ms. DiPiazza presented. The court is also not persuaded that the probative value of this evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403.

Plaintiff also objects to Captain Huth's expert testimony on this same topic, though it is not clear if the basis of the objection is speculation, lack of foundation, or improper endorsement of the officers' version of events. Consistent with the court's ruling on plaintiff's *Daubert* motion, Huth may not opine on Pihlaja's (or any witness's) credibility, but he may assume certain facts in rendering his opinions, as long as they are supported by the record, and he may discuss perceived deviations or adherence to accepted training and practice, as well as point out facts in evidence (or expected to be put in evidence) that contradict plaintiff's version of the events. *Estate of Robinson*, 2017 WL 564682, at *10; *see also Williams v. Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 2228 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the

expert.").

With the qualification that defendants may not present testimony based on unfounded speculation (or testimony supporting an officer's independent judgment to employ force *not* properly based on accepted police practice and training or real world events), worst-case hypotheticals may well be admissible. Accordingly, plaintiff's motion to exclude is DENIED.

### 11. Plaintiff's motion to exclude opinion testimony about what Ms. DiPiazza would have done (dkt. #140).

This motion raises similar issues as motion in limine #10. As defendants acknowledge in their opposition, no one can say for sure what Ms. DiPiazza *would* have done if she had not been shot, and no witness will be permitted to testify as if they have that knowledge. Of course, the officers may testify as to what they observed, any inferences they drew from their observations, what possibilities they anticipated, and what options or contingencies they considered. As discussed, "police practice" experts may also assume facts that are or will soon be supported in the record, and they may apply their expertise to those facts to opine on whether the officers' conduct comported with contemporary police tactics, training, and customs, including any reasonably identifiable risk factors. With those caveats, plaintiff's motion to exclude the narrow category of testimony identified (about what "would" have happened to Ms. DiPiazza) is GRANTED.

### 12. Plaintiff's motion to exclude testimony regarding "reactionary gap" principle (dkt. #141).

This motion raises similar issues to plaintiff's motions in limine ##10 and 11,

having to do with the "reactionary gap" principle, which there appears no dispute was an aspect of defendants' police training. Generally, this principle advises officers to consider the danger of a delayed response to a threatening action, because even a quick reaction to an initial, unanticipated action will result in an inevitable, if short, time lag (hence, the "gap"). For the reasons already explained, this evidence is also admissible, assuming it is introduced with proper foundation by an appropriate witness. More precisely, while the officers may *not* speculate about what they "would" do in a general, hypothetical situation -- disconnected from the actual facts of this case, *Nelson*, 810 F.3d at 1074-75 -- they may describe how their observations, inferences, and actions in this case were informed by their training. Similarly, experts may do the same, subject to the boundaries already explained above. For these reasons, the court GRANTS plaintiff's motion in limine #12.

### 13. Plaintiff's motion to exclude "suicide by cop" theory (dkt. #142).

To the extent plaintiff objects to Captain Huth's explanation of a so-called "suicide by cop" theory in his deposition, that opinion and testimony is excluded because it appears superficial, unsupported and unfounded as described. More importantly, it was not disclosed in Huth's expert report as required under Rule 26(a)(2)(B). (*See* dkt. #199, Op. & Order, at 11-12.) As for the defendant officers' own purported "knowledge of suicide-by-cop risks," defendants are less than clear as to the scope of their training or expertise in this subject, beyond a seed planted in the backs of their minds that the armed subject might have a death wish. Although the defendants may certainly testify that this possibility was part of their own thought process, the court is skeptical that the

existence of a formal "theory" can be admitted, especially without an expert to explain it properly. Nevertheless, the court will RESERVE on this motion until the final pretrial conference, giving defendants an opportunity to make a proffer as to the relevance of such a theory to defendants' decision-making.

### 14. Plaintiff's motion to inspect ballistic shield (dkt. #144).

Since defendants do not oppose this motion, it is GRANTED, and the jury will be given an opportunity to inspect the ballistic shield during deliberations provided its weight and maneuverability are truly in issue.

### 15. Plaintiff's motion to strike non-retained police practices expert (dkt. #145).

Plaintiff moves to strike defendants' "in-house," police practices expert, Sgt. Timothy Patton, primarily on procedural grounds, since defendants failed to disclose his expert opinions. However, defendants *did* timely disclose that Patton is a current MPD employee who "may testify regarding training provided to Madison police officers on principles of contact, cover, reactionary gap, use of force options and decision-making, crisis intervention techniques, and tactical considerations, as well as defendants' actions being consistent with such training." While defendants half argue that Patton will only be a fact (not an expert) witness, they half argue that he was exempted from having to submit a report under Rule 26(a)(c)(C) because he is a hybrid, "fact-opinion witness," who is an employee of the police department and regularly provides training to its officers. This may be enough for Patton to testify factually as to the training he provides to officers generally, and certainly to defendants in particular. Defendants failure to

disclose him formally as a Rule 26 expert on a timely basis, combined with a *complete* failure to provide "a summary of the facts and opinions to which [he] is expected to testify," precludes his offering any opinion as to whether the officers' actions were consistent with that training. Accordingly, plaintiff's motion #15 is GRANTED IN PART and DENIED IN PART as set forth above.

### 16. Plaintiff's motion to preclude defendants from testifying contrary to admissions (dkt. #146).

Defendants agree that they may not testify contrary to their admissions, and only take exception to one of the several, purported admissions that plaintiff highlights. As to that exception, the court agrees that even though defendants admitted that the "MPD's Administrative Review concluded" certain facts, the individual defendants may nonetheless testify to their own, individual observations regarding those facts, whether consistent with the conclusions in the MPD's review or not. With that caveat, this motion is GRANTED.

### 17. Plaintiff's motion to exclude portions of forensic expert opinion (dkt. #147).

Finally, plaintiff moves to preclude certain opinions offered by defendants' forensic expert, Michael A. Knox, on the grounds that they (1) were not properly disclosed, (2) amount to credibility determinations, and (3) are otherwise unreliable and unsupported. In general, no expert may offer opinions that were not properly disclosed nor opine on another's credibility, which is the province of the jury. Of course, as defendants point out, an expert witness may properly offer opinions (assuming they are otherwise admissible) that tend to corroborate or undermine the truth or accuracy of

another's account or testimony. With those as guiding principles, the court endeavors to address the more specific opinions that plaintiff challenges.

As an initial matter, plaintiff objects to Knox testifying that officers Bailey and Pihlaja gave commands for Ms. DiPiazza to drop her gun, which is at least partially disputed, and also to Knox's characterization that officers were dispatched to a "domestic violence" scene, when the dispatch transcript shows that officers were actually informed of a "physical domestic involving a handgun," a "domestic between a 17 and the girlfriend. The girlfriend is in Apartment 2 with a handgun." The court agrees with the first objection, though less so with the latter. More importantly, plaintiff's objections implicate a broader concern that the court will again take the opportunity to highlight. Both parties (and all of their expert witnesses) must understand that *no* experts should be giving authoritative testimony about *what happened* on the night of May 18, 2014, especially based on their review of documents given by counsel who retained them, or other secondhand accounts, unless they somehow have personal knowledge of those factual matters. The expert's role is *not* to resolve factual disputes, or even to give narrative factual accounts at all, but rather to draw from their specialized knowledge and expertise to express *opinions* based on a set of undisputed or assumed facts. (*See* dkt. #199, at 6.) Any assumptions must be disclosed and supported by evidence offered or to be offered at trial from which the jury could (although it need not) ultimately reach the same conclusion. *Id.* at 6-7, n.1. The court will not permit *any* expert testimony that fails to conform with this general and long-established paradigm. *See Williams v. Illinois*, 132 S. Ct. 2221, 2228, 2234-35 (2012).

Applying that paradigm to the two, specific examples plaintiff raises, Knox may *not* testify what defendants did or did not do where a factual dispute exists at trial, though he may assume certain facts where justified. In contrast, Knox can describe what his own expertise tells him was a "domestic violence" scene subject to cross examination by opposing counsel. Hopefully, these examples provide counsel and the parties' experts with some additional guidance as to what will and will not be allowed at trial. To the extent questions remain, the court encourages counsel to raise them at the final pretrial conference, rather than having an expert be summarily cut off before the jury, or worse.

Plaintiff further claims that Knox, as a "respondent" expert, should not be allowed to opine to "exactly where Ms. DiPiazza was standing when she was shot," based on "blood spatter analysis," since plaintiff bears no burden of persuasion on that issue. But that is not the issue at all. Rather, a "respondent" expert may do just that: respond. Since plaintiff put forth its own forensic expert (Matthew Noedel) to opine on Ms. DiPiazza's exact location when she was shot, based in part on the location of blood stains -- and whether or not Noedel considered "blood spatter analysis" in this opinion seems an immaterial distinction -- Knox's expert testimony is a proper response, opining as he does to the contrary on the same question. In these circumstances, plaintiff's contention that Knox's opinion was not properly disclosed is, therefore, wholly without merit.

Ultimately, plaintiff's arguments about the unreliability and inaccuracy of Knox's "blood splatter" opinions appear good fodder for undermining his testimony on cross examination, but they suggest neither that Knox lacks the expertise to render those opinions nor that his opinions lack the proper foundation or methodology under Rule

702.  (*See* dkt. #199, at 1-3.)  Therefore, the court DENIES plaintiff's motion to exclude portions of Knox's expert opinion, except to the extent he would be violating the general parameters applicable to all experts at this trial as set forth above.

## B. Defendants' Motions in Limine

### 1. Defendants' motion to preclude the number of shots fired and wounds sustained (dkt. #125).

Defendants cite a number of cases in which the officers' force was found to be reasonable despite firing a volley of bullets (or otherwise using a significant or sustained amount of force), but they cite *no* authority holding that the number of shots fired is irrelevant or inadmissible.  The same is true regarding evidence of the wounds the victim sustained.  While this evidence has more obvious relevance (and certainly a lower risk of misuse) in the damages phase of a trial, it may still be relevant in the liability phase by providing some indication of the level or nature of force employed, the decisions defendants Bailey and Pihlaja made under the circumstances, their instinctual actions, and, potentially, the precise location or position or orientation of Ms. DiPiazza's body at the time she was shot.[2]

The court acknowledges that this evidence will likely be of limited probative value, and is potentially inflammatory, particularly the photographic imagery.  The court will, therefore, require plaintiff to make a short proffer to the court at the final pretrial conference before definitively deciding on its admissibility during liability.  In particular,

---

[2] As for this latter evidence, defendants' objections regarding its practical and scientific shortcomings are powerful, but this still goes to the weight the evidence deserves, not its admissibility.

the court will consider excluding in the liability phase of trial any photo or description that raises an unnecessary risk of unfair prejudice, confusing the issues, misleading the jury, undue delay or wasting time.  Fed. R. Evid. 403.  As of now, however, the court is not persuaded that these dangers substantially outweigh the probative value of *all* such evidence.  Accordingly, the court will not categorically exclude this evidence.  Instead, the motion is DENIED in part and RESERVED in part.

### 2. Defendants' motion to preclude Clark supplemental report and other forensic evidence of orientation  (dkt. #126).

Because the current record remains somewhat muddled, the court is unable to rule definitively on defendants' arguments that evidence of Ms. DiPiazza's body at the time she was shot should be excluded on procedural grounds.  As an initial matter, the court is unconvinced that any deficiency in disclosure of (purported) opinions to be offered by Dane County Medical Examiner Dr. Vincent Tranchida will cause unfair prejudice to defendants.  However, defendants' procedural objections to plaintiff's "police practices" expert Roger Clark's last minute, supplemental report may well do so.  Even if allowed, Clark's supplemental opinions must be limited to areas within his expertise, and even then only after plaintiff establishes a proper foundation.

As an initial matter, plaintiff *timely* disclosed that Dr. Tranchida "may testify about all matters concerning the autopsy, including his opinions, from his observation of injuries, as to the positioning and location of Ms. DiPiazza's body at the time she sustained her fatal injuries."  So, apparently, did defendants.  To make matters worse, no one took Dr. Tranchida's deposition until March 22, 2017.  Moreover, as defendants

rightly point out, Tranchida *specifically* declined to offer any opinion in his deposition as to the exact positioning or orientation of Ms. DiPiazza's body at the moment she was shot. Indeed, Tranchida testified that it was "beyond the ability of the autopsy" to make such a factual determination.

This would seem to put an end to the matter, except that plaintiff now contends that Dr. Tranchida's testimony on this subject somehow provides "new facts" that are *consistent with* a theory that Ms. DiPiazza's back was turned to the defendant officers when they shot her, as set forth in Clark's March 29, 2017, supplemental report.

While no one seems to question that Dr. Tranchida possesses the knowledge and foundation to testify to the matters covered in his deposition, defendants first argue that Tranchida's testimony covered more topics than were properly disclosed, because he discussed the "orientation" of Ms. DiPiazza's body instead of merely its "positioning and location," albeit without giving a clear opinion. This would seem so much hair splitting, especially given that Dr. Tranchida seems to be the most neutral expert in the case -- possessing such unique knowledge that *both* parties listed him in their Rule 26(a)(2) disclosures. If anything, *defendants* have had greater access and opportunity than has plaintiff to familiarize themselves with Dr. Tranchida's opinions.

Defendants' much stronger procedural objection is that plaintiff's experts, including Clark, all disavowed having an opinion as to the body's orientation at their respective depositions. Even now, plaintiff acknowledges that neither of its other experts, Noedel and Stahlke, will opine on the issue of "bodily orientation" as "the scope of their opinions are properly related to the body's location vis-à-vis the bedroom door." (Dkt.

162, at 8.)  Thus, the contested issue in motion in limine #2 comes down to the admissibility of Clark's untimely "supplemental" report.

The court already granted plaintiff's motion to supplement the summary judgment record with this report, although Clark's supplemental opinion carried little weight in the court's determination of the issues involved in its summary judgment decision.  (Dkt. #91, at 2 n.2.)  That ruling, however, does not determine whether Clark's additional opinion should reach the jury if it is untimely or otherwise improper.

Setting aside for the moment that plaintiff's disclosure of the supplemental opinion under Rule 26 was untimely, Clark must confine his opinion testimony as a "police practices" expert to his area of expertise as already explained above and in the court's prior order granting plaintiff's *Daubert* motion to exclude part of Captain Huth's testimony.

As Clark lacks any scientific expertise *and* has no personal knowledge of Ms. DiPiazza's autopsy, the court would be highly skeptical of his purporting to offer an opinion about the orientation of her body even if timely.  Still, Clark's supplemental report does not quite do that.  Instead, he notes that Dr. Tranchida's deposition testimony "introduces the prospect, consistent with the forensic evidence" that Ms. DiPiazza had her back turned to the defendant officers when they shot her.  (Dkt. 73-1, at 1.)  Clark then proceeds to explain, "in light of" that information, how officers are trained "in general, and especially in negotiating the surrender of a previously barricaded individual," to control a surrendering individual by having her clasp her hands behind her head, back up, drop to her knees, and then to her stomach face down on the ground, or

otherwise possibly have the subject "face away" from the officers before they approach her. *Id.* at 7.

Again timeliness aside, Clark's opinions about how officers are trained to control the "surrender of a previously barricaded individual" might be admissible. On the one hand, Clark offers relevant opinion testimony about how officers are prepared to handle certain situations, which plaintiff may wish to use to counter some of defendants' evidence of police practices and training. On the other hand, his new opinion tacitly assumes or suggests that a certain version of the facts played out, contrary to the testimony of all witnesses who were present, if self-interested, with only the slightest of factual changes -- Dr. Tranchida's offering the mere "possibility" of DiPiazza's back being oriented toward the officers.

As such, Clark's opinions seem closer than anything defendants have offered to the kind of impermissible speculation (divorced from the facts in *this case*) that was allowed by the trial court in error and ruled inadmissible by the Seventh Circuit in *Nelson*, 810 F.3d at 1074-75. Even if allowed, this change is not enough to justify plaintiff's last-minute disclosure of this opinion.

Accordingly, the court is strongly inclined to grant defendants' motion in limine #2. Still, given the odd posture here, the court RESERVES until hearing final argument, if any, from plaintiff's counsel at the final pretrial conference.

### 3. Defendants' motion to permit jury view (dkt. #128).

Even in theory, the court is skeptical that a jury view of the location where the shooting took place would be of much assistance to the jurors' discharge of their duties,

at least by comparison to the effective use of video, pictures and diagrams, opening and closing statements by counsel, and the descriptions and credibility of witnesses. Regardless, the court agrees with plaintiff's practical objections: defendants provide no indication that the apartment is currently unoccupied, furnished similarly, or significantly remodeled; even more importantly, they propose no plan to deal with the logistics involved in transport. Thus, there is at least as much danger of confusing and misleading jurors as there is potential to help them, as well as the prospect of expense and waste of time. As in virtually all other cases in this court, defendants will have to use photographs, floor plan diagrams and other trials adis to give jurors a sense for the scene surrounding the shooting. Accordingly, this motion is DENIED.

4. **Defendants' motion to preclude criticism of pre-seizure conduct (dkt. #129);**

5. **Defendants' motion to preclude evidence that officer conduct was inconsistent with polices and training (dkt. #130); _and_**

6. **Defendants' motion to preclude criticism for not using less than lethal force (dkt. #131).**

Defendants move to preclude "criticism" of the officers' pre-seizure tactics, including "evidence, reference to, or argument characterizing" decisions as incorrect or improper. They also move to preclude criticism for not using non-lethal force, as well as evidence that any officer's conduct was inconsistent with police policies and training. These motions are largely misguided and overreaching. Regardless, they cannot be granted as posed.

Although "pre-seizure conduct" cannot itself be the basis for an independent,

unplead Fourth Amendment violation, it may be considered as part of the "totality of circumstances" that render the officers' use of force was reasonable or unreasonable. Therefore, evidence of pre-seizure conduct, including as relied upon by experts, will not be excluded simply because it cannot give rise to a separate violation. *See Estate of Robinson*, No. 15-CV-502-JDP, 2017 WL 564682, at *10, *14 (citing Seventh Circuit cases). In fairness, defendants do not just stop at requests for pronouncements of sweeping exclusions, providing concretely some 22 specific examples -- all from Clark's expert report -- of testimony that they expect plaintiff to introduce, each of which they further contend improperly "criticize" defendants or argue that they could or should have done things differently.

As a general matter, plaintiff is reminded that Clark must limit his opinion testimony according to the general principles of admissibility already explained above in this order, as well as the court's earlier order ruling on plaintiff's *Daubert* motion to exclude the testimony of Captain Huth. Further, plaintiff will not be permitted to *argue* for a liability finding based on any of defendants' "pre-seizure" decisions, miscalculations or missteps occurring earlier in the night. *Estate of Heenan ex rel. Heenan v. City of Madison*, 111 F. Supp. 3d 929, 945 (W.D. Wis. 2015). Nevertheless, defendants have cited no authority holding that the *admission* of such background evidence is improper, so the court will not exclude it categorically.

Moreover, since defendants plan to call their own expert, Captain Huth, to opine that the officers' conduct was consistent with contemporary police practices, training, and customs, it would appear inconsistent, even unfair, to exclude plaintiff from offering

contrary evidence on that very same subject, and even more so for choosing not to file a *Daubert* motion to exclude Clark's or any of plaintiff's other expert's testimony. Accordingly, Clark will be allowed to testify generally that defendants' conduct failed to comport with police practices and training to the same extent as Huth, provided it is in his expert report. (*See generally* dkt. #199.)

Similarly, this court has already ruled that Huth may testify regarding whether less-than-lethal projectiles or other tools are considered appropriate options for officers faced with the possible use of deadly force. *Id.* at 9. Of course, the jury may consider the availability and advisability of non-lethal alternatives in its ultimate determination of objective reasonableness. *Estate of Heenan*, 111 F. Supp. 3d at 942.

For these reasons, all three of defendant's motions ##4 through 6 are DENIED without prejudice to defendants offering a narrowed, focused motion to preclude truly extraneous or overly prejudicial criticisms.

### 7. Defendants' motion to preclude Clark from expressing legal conclusions (dkt. #132).

Clark's opinion testimony is subject to the same limitations and principles that the court has already enunciated with respect to Huth, and shall conform with the same general and long-established paradigm of the proper role of the expert in these cases. Specifically, Clark may not render legal opinions or reach legal conclusions, including attempts to opine on what constitutes an "imminent threat" generally, on whether Ms. DiPiazza posed such a threat to the officers in this case in particular, or what a "reasonable officer" would do under similar circumstances. Consistent with his own

expert report and the court's rulings on this topic, Clark may, however, opine as to proper contemporary police practices, as well as whether the defendants' actions here comported with those practices. With those caveats, defendants' motion is GRANTED.

### 8. Defendants' motion to preclude other use of force incidents (dkt. #134).

Defendants move to preclude evidence of two, prior use-of-force incidents involving non-party officers -- Bee Xiong and Sgt. Shannon Blackmore -- who did *not* discharge deadly force, despite facing armed suspects who pointed or fired guns at them. The court agrees that evidence of these incidents has little or no relevance to the question whether the defendants used force reasonably in this case. Moreover, any arguable probative value would be substantially outweighed by a danger of confusion as to the factual or legal issues specifically in dispute here or otherwise misleading the jury. Fed. R. Evid. 403. The motion is GRANTED.

### 9. Defendants' motion to preclude evidence of "winning mindset" training (dkt. #135).

Defendants further move to preclude evidence of MPD training materials that make an analogy comparing most people in society to "sheep," police officers to "sheepdogs," and predators or criminals to "wolves." Given that there is no direct *Monell* claim against the City of Madison in this case, the court agrees that: this evidence has very little probative value; it might be unfairly prejudicial against the officer-defendants; and it should be excluded from evidence, at least in plaintiff's affirmative case. The court reserves, however, as to the (slight) possibility that this subject might be appropriate on cross examination to impeach Captain Huth, who has written and opined on the topic.

With that caveat, the motion is GRANTED.

**10. Defendants' motion to preclude evidence of awards (dkt. #137).**

Plaintiff does not oppose this motion with respect to the liability phase of trial, but contends it may be relevant to the damages phase. While the court remains skeptical of that argument, it will reserve ruling until and if we reach that stage. With that caveat, the motion is GRANTED as to the initial phase of trial.

**11. Defendants' motion to preclude evidence of indemnification (dkt. #139).**

Plaintiff does not oppose this motion, but would ask the court to revisit the issue should defendants open the door by arguing or otherwise leaving the jury with the impression that the defendant-officers will face a financial or other hardship if forced to pay damages in this case. Although defendants will be precluded from doing so, the motion is GRANTED.

**12. Defendants' motion to preclude state of mind evidence by plaintiff's expert Clark (dkt. #143).**

The court refers generally to its previous statements on the admissibility of expert opinion testimony. More specifically, Clark purports to opine -- somewhat in his expert report and much more directly in his deposition -- as to defendant officer Bailey's mental state, describing him as "totally off the rails." Because Clark has not demonstrated the professional qualifications or foundation to opine on such matters under Federal Rule of Evidence 702, and because his opinion is prejudicial, vague and unsupported, it will be excluded and the motion is GRANTED.

ORDER

IT IS ORDERED that:

1. Plaintiff's motion in limine #1 (dkt. #118) is GRANTED.

2. Plaintiff's motion in limine #2 (dkt. #119) is GRANTED.

3. Plaintiff's motion in limine #3 (dkt. #120) is GRANTED as set forth above.

4. Plaintiff's motion in limine #4 (dkt. #121) is GRANTED as set forth above.

5. Plaintiff's motion in limine #5 (dkt. #122) is GRANTED as set forth above.

6. Plaintiff's motion in limine #6 (dkt. #123) is GRANTED as set forth above.

7. Plaintiff's motion in limine #7 (dkt. #124) is GRANTED as set forth above.

8. Plaintiff's motion in limine #8 (dkt. #133) is GRANTED as set forth above.

9. Plaintiff's motion in limine #9 (dkt. #136) is GRANTED.

10. Plaintiff's motion in limine #10 (dkt. #138) is DENIED as set forth above.

11. Plaintiff's motion in limine #11 (dkt. #140) is GRANTED as set forth above.

12. Plaintiff's motion in limine #12 (dkt. #141) is GRANTED.

13. Plaintiff's motion in limine #13 (dkt. #142) is RESERVED.

14. Plaintiff's motion in limine #14 (dkt. #144) is GRANTED.

15. Plaintiff's motion in limine #15 (dkt. #145) is GRANTED IN PART and DENIED IN PART as set forth above.

16. Plaintiff's motion in limine #16 (dkt. #146) is GRANTED as set forth above.

17. Plaintiff's motion in limine #17 (dkt. #148) is DENIED as set forth above.

IT IS FURTHER ORDERED THAT:

1. Defendants' motion in limine #1 (dkt. #125) is DENIED IN PART and RESERVED IN PART as set forth above.

2. Defendants' motion in limine #2 (dkt. #126) is RESERVED.

3. Defendants' motion in limine #3 (dkt. #128) is DENIED.

4. Defendants' motion in limine #4 (dkt. #129) is DENIED as set forth above.

5. Defendants' motion in limine #5 (dkt. #130) is DENIED as set forth above.

6. Defendants' motion in limine #6 (dkt. #131) is DENIED as set forth above.

7. Defendants' motion in limine #7 (dkt. #132) is GRANTED.

8. Defendants' motion in limine #8 (dkt. #134) is GRANTED.

9. Defendants' motion in limine #9 (dkt. #135) is GRANTED as set forth above.

10. Defendants' motion in limine #10 (dkt. #137) is GRANTED as set forth above.

11. Defendants' motion in limine #11 (dkt. #139) is GRANTED.

12. Defendants' motion in limine #12 (dkt. #143) is GRANTED.

   Dated this 8th day of May, 2017.

                    BY THE COURT:

                    /s/

                    WILLIAM M. CONLEY
                    District Judge